Casey, Ob. J.,
delivered tbe opinion of the court.
The claimant is, and during the war of the rebellion was, a citizen and resident of Charleston, South Carolina. In April, 1863, he became owner, by purchase at an administrator’s sale, of the steamboat De Kalb. Previous to this purchase he had been the agent for the owner for the same boat. At the time of the purchase, and probably for some time before, this steamboat was in the iiossession of the confederate authorities. She was used for the transportation of men, arms, and supplies, in the harbor of Charleston. On the evening before the evacuation of Charleston by the confederate forces, the persons in charge of the boat were directed to proceed to one of the islands in the harbor to bring off some men and material; but, at the suggestion of the claimant, the engineer in charge so disabled the boiler as to prevent her from going upon that service. In this condition she was lying at the wharf when the rebel forces evacuated the city of Charleston. With a gunboat and other craft lying near she was set on fire, cut loose from , her moorings, and drifted out into the stream. At this time the claimant, with several persons as assistants, went on board; she was either conveyed by them, or drifted, on to the beach at James island, in the harbor of Charleston. In this place and condition she remained when the city was captured by the national forces. After possession of the city had been taken, G-. A. B. Tower, an engineer in the navy, was placed in charge of captured steamers in the harbor of Charleston; but by what order or what were the nature and character of his duties does not appear. The witnesses say he was so detailed by G-en. Schim-melpfennich. How an officer of the navy was subject to the orders of a general of .the army is not explained by the evidence, nor is the order itself given by which the extent of his authority could be judged. Shortly after the evacuation, Tower, having become acquainted with the claimant, and learning of his ownership of the steamer De Kalb, and that she was lying off James Island in a disabled condition, entered into an arrangement with Slawson to have her put in a sailing condition and brought back to the city, and agreed with him to place her in the service of the United States government. No term s or price were agreed upon for the hire of the boat, except that she was to be paid in proportion what other boats received for their services.
The steamer was accordingly brought to the city, turned over *94 to Mr. Tower, and sbe was placed on duty in the government service. Mr. Tower in a short time turned the boat over to the quartermaster in charge of the harbor transportation at Charleston. He had the boat overhauled and extensive repairs made upon her, amounting in the aggregate to over $15,000.' She continued in the United States service for the period of 402 days. She was then turned over by the quartermaster to the special agent of the Treasury Department as captured property, and was by him sold under the act 12th March, 1863. At that sale she was purchased by or for the claimant. The net proceeds were paid into the treasury of the United States.
No hire was ever paid to the claimant for the boat; nor was his right to such pay ever acknowledged or assented to by the quartermaster under whose charge she performed the service. But she was always treated by him as captured property.
This suit is now brought on the alleged contract made with Tower. And it is averred that the services of the boat were reasonably worth $75 per day, amounting to the sum of $30,150.
The claimant proves his loyalty, and that very soon after the surrender of Charleston he came forward voluntarily and took the oath of allegiance to the United States.
A number of difficult and abstruse questions were discussed on the hearing of this case; but we think that the legal principles which conclusively rule this case are few and simple. The case is put by the claimant entirely upon the contract, and his claim for compensation in this court could rest on no other ground. If there be no contract, express or implied, he has no standing in court. And even though there should be an implied contract arising from the capture or appropriation of the claimant’s private property to make just compensation, yet that appropriation, if by the army or navy engaged in the suppression of the rebellion, and during its continuance, is withdrawn from our cognizance and placed beyond our jurisdiction by the express and -explicit terms of the act of Congress of 4th July, 1864. The question therefore arises, was there an express contract between the United States and this claimant for the use of his boat ? The fatal defect in the plaintiff’s case is, that no right or authority to enter into such a contract is shown to exist in the officer or agent by whom it is ’ alleged it was made. Tower was an engineer in the navy. The duties and functions of his office had no relation to or connection with procuring trans- *95 portatiou for tbe army. That duty belonged to, and was, by tbe act of Congress approved éth July, 1864, entitled “Aivaet to provide for the better organisation of the quartermasters’ department,” vested in tbe 3d division of tbe Quartermaster General’s office, (13 Stat. L.,394,2Bright. Dig., p. 14, pi. 40, cl. III.) There may be some doubt whether — situated as this jaroperty was, and falling into tbe hands of the United States with tbe capture of tbe city, it having been, up to tbe fall of tbe city, in the actual occupancy and service of tbe enemy for belligerent purposes— a regular quartermaster even could have made a valid contract for her services. But it is unnecessary for us to decide this question. The officers to whom this duty belonged, an d in whom all the power and authority delegated by tbe United States in the premises was reposéd, never made or recognized the existence of any contract with the claimant for the charter or hire of this steamboat. All their conduct and acts treated it as captured property appropriated by tbe army, and when no longer needed sold as such by the treasury agent, to whom it was delivered over by the military authorities.
; This clearly brings tbe case within the provisions of tbe act of the 4th July, 1864, talcing away our jurisdiction. We are, therefore, compelled to dismiss tbe petition, and adjudge that the defendants go thereof without day.